**UNITED STATES of America,
Plaintiff,**

v.

**John Richard MAYHEW,
Jr., Defendant.**

No. 2:03–cr–165.

United States District Court,
S.D. Ohio,
Eastern Division.

Aug. 5, 2005.

David DeVillers, United States Attorney, Salvador A. Dominguez, U.S. Attorney's Office, Columbus, OH, for Plaintiff.

Frederick Douglas Benton, Isiah Gant, Nashville, TN, Steven Scott Nolder, Federal Public Defender, Columbus, OH, for Defendant.

*OPINION AND ORDER REGARDING DEFENDANT'S MOTIONS IN LIMINE TO EXCLUDE WRITTEN AND ORAL STATEMENTS*

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on Defendant's Motions in Limine to Exclude Kristina McKibben's Oral Statement, Kristina McKibben's Written Statements Made On or After August 7, 2003, and Kristina McKibben's Written Statements Made Before August 7, 2003. For the reasons stated herein, the Court **DENIES** Defendant's Motion in Limine to Exclude Kristina McKibben's Oral Statement [Docket No. 39]; the Court **GRANTS in part** and finds **MOOT in part** Defendant's Motion in Limine to Exclude Kristina McKibben's Written Statements Made On or After August 7, 2003 [Docket No. 84]; (3) the Court **GRANTS in part** and **DENIES in part** Defendant's Motion in Limine to Exclude Kristina McKibben's Written Statements Made Before August 7, 2003 [Docket No. 135].

## II. FACTS

The essential facts, as alleged by the government, are as follows. On the night of August 7, 2003, Defendant went to a home at 2258 Springmont Avenue, Columbus, Ohio, where he shot and killed his ex-girlfriend, Tamara McKibben, and her fiancé, Frank Rigsby. Defendant then kidnapped his and Tamara McKibben's daughter, Kristina McKibben, from the home. Defendant took Kristina McKibben with him in his car and drove with her to West Virginia. On August 9, 2003, Defendant, still with Kristina McKibben in the car, was pulled over by a West Virginia state trooper for a minor traffic offense. When the officer approached the car, Defendant drew a gun and shot the officer. A 30–minute car chase ensued. Defendant ultimately was stopped by a roadblock and tire spikes. While police were ordering him to exit the car, Defendant shot Kristina McKibben twice, then shot himself once in the chest. Kristina McKibben was taken by ambulance to the nearest hospital, and died shortly thereafter.

While Miss McKibben was in the ambulance, a police officer, Sergeant J.L. Cahill, interviewed her, recording the entire conversation on an audiotape. On the tape, Miss McKibben indicated that Defendant killed Tamara McKibben and Franklin Rigsby on Thursday, August 7, 2003, and then kidnapped her. She also described Defendant's travel patterns since the August 7, 2003 shooting, the nature and circumstances of Defendant's prior conviction, and the type of gun he used to shoot at the police on August 9, 2003. The taped statement also reveals that Miss McKibben was in the midst of receiving some sort of medical treatment when she made her statement. While the voices on the tape impart a sense of urgency, Miss McKibben answers all of Sergeant Cahill's questions coherently, articulately, and without hesitation. Defendant now moves to exclude this audiotaped statement as well as various letters written by Miss McKibben both before and after August 7, 2003.

## III. ANALYSIS

### A. Confrontation Clause

The Confrontation Clause of the Sixth Amendment states, "In all criminal prose-

cutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. Prior to the Supreme Court's watershed decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) governed the admissibility of out-of-court statements under the Confrontation Clause. *Roberts* permitted an unavailable witness's out-of-court statement to be admitted against the accused if the statement had adequate indicia of reliability. *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531. A statement was considered to have sufficient indicia of reliability if it either fell within a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Id.*

The Supreme Court, in *Crawford*, "introduced a fundamental re-conception of the Confrontation Clause." *United States v. Cromer*, 389 F.3d 662, 671 (6th Cir. 2004). *Crawford* held that testimonial, out-of-court statements offered against the accused to establish the truth of the mat-

ter asserted may only be admitted where the declarant is unavailable and where the defendant has had a prior opportunity for cross-examination.[1] *Crawford*, 541 U.S. at 68, 124 S.Ct. 1354. *Crawford's* holding reaffirmed the importance of the Confrontation Clause, finding that "[w]here testimonial statements are involved, we do not think the Framers meant to leave the Sixth Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' "[2] *Id.* at 61, 124 S.Ct. 1354. Thus, under *Crawford*, when the prosecution seeks to introduce "testimonial" statements against a criminal defendant, the defendant generally will have a right to confront those witnesses.

The *Crawford* decision, however, noted one potential exception and one definite exception to a defendant's rights under the Confrontation Clause. First, in a footnote, the Supreme Court observed that a dying declaration may present a historically grounded exception to the Confrontation Clause, but if so, "it is *sui generis*."[3] *Id.* at 55 n. 6, 124 S.Ct. 1354. Second, the

**1.** *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), involved a tape-recorded statement given by the defendant's wife to the police describing the stabbing with which the defendant was charged. Pursuant to the state marital privilege, the defendant's wife did not testify at trial, so the defendant had no opportunity to cross-examine her. The statement nevertheless was admitted at trial, over the defendant's objections, because the trial court determined that the statement had "particularized guarantees of trustworthiness." *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531.

**2.** The Court found the admission of statements deemed reliable by a judge to be fundamentally at odds with the right of confrontation: "Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes." *Crawford*, at 62, 124 S.Ct. 1354.

**3.** The footnote reads in its entirety:

The one deviation we have found involves dying declarations. The existence of that exception as a general rule of criminal hearsay law cannot be disputed. *See, e.g., Mattox v. United States*, 156 U.S. 237, 243–244, 15 S.Ct. 337, 39 L.Ed. 409 (1895); *King v. Reason*, 16 How. St. Tr. 1, 24–38 (K.B.1722); 1 D. Jardine, Criminal Trials 435 (1832); Cooley, Constitutional Limitations, at *318; 1 G. Gilbert, Evidence 211 (C. Lofft ed. 1791); *see also* F. Heller, The Sixth Amendment 105 (1951) (asserting that this was the *only* recognized criminal hearsay exception at common law). Although many dying declarations may not be testimonial, there is authority for admitting even those that clearly are. *See Woodcock, supra,* at 501–504, 168 Eng. Rep., at 353–354; *Reason, supra,* at 24–38; Peake, Evidence, at 64; *cf. Radbourne, supra,* at 460–462, 168 Eng. Rep., at 332–333. We need not decide in this case whether the Sixth

Court explicitly preserved the forfeiture by wrongdoing exception because, unlike other exceptions to the Confrontation Clause, it "does not purport to be an alternative means of determining reliability." *Id.* at 62, 124 S.Ct. 1354. Rather, the Court continued, forfeiture by wrongdoing applies only when a criminal defendant is responsible for the witness's unavailability, thereby "extinguish[ing]" a defendant's Confrontation Clause rights "on essentially equitable grounds." *Id.* at 62, 124 S.Ct. 1354.

The facts of the case sub judice invite this Court to confront questions *Crawford* left open. First, the Court must determine whether the Miss McKibben's audiotaped statement to the police, which was made minutes before her death and recounts the cause thereof, is properly admitted as a dying declaration. Second, the Court must address whether several letters written by Miss McKibben are admissible in light of her unavailability.

### B. Audiotaped Statement of Kristina McKibben

As a threshold matter, the Court finds Miss McKibben's statement testimonial in nature. A "reasonable person in the declarant's position would anticipate [her]

statement being used against the accused in investigating and prosecuting the crime." *Cromer,* 389 F.3d at 675. Indeed, the parties do not dispute this determination. The government argues that notwithstanding the statement's testimonial nature, it is admissible as either an excited utterance[4] or a dying declaration, asserting that *Crawford* contemplated both as exceptions to the Confrontation Clause. Defendant counters that while the Supreme Court may have refrained from speaking directly to the continuing viability of dying declarations, the spirit of *Crawford* bars their admission. Dying declarations, Defendant argues, do not deserve the indicia of reliability long bestowed upon them. Relying on Charles W. Quick, *Some Reflections on Dying Declarations,* 6 How. L.J. 109, 112 (1960), Defendant suggests that dying people often make "self-serving declarations, such as false accusations, in order to destroy their enemies, and false excuses, in order to save their friends." *Id.* at 112.

The Court finds the audiotaped statement admissible, but rejects the government's argument that dying declarations are an exception to the Confrontation Clause.[5] Instead, the Court, for the rea-

---

Amendment incorporates an exception for testimonial dying declarations. If this exception must be accepted on historical grounds, it is sui generis.
*Crawford,* at 55 n. 6, 124 S.Ct. 1354.

**4.** After the parties' papers addressed this evidentiary issue, the Sixth Circuit, in *United States v. Arnold,* 410 F.3d 895, 904 (2005) held that testimonial excited utterances are not an exception to the Confrontation Clause's requirements. *Id.* at 904 (holding that a declarant's excited utterances to the police were testimonial and therefore inadmissible, reasoning that the declarant, whose statements described criminal activity, "could reasonably expect that her statements would be used to prosecute [the defendant]").

**5.** The Court doubts the inherent reliability of such statements.

For example, the declarant might have been in a revengeful state of mind which would color his dying statements. No longer subject to the fear of retaliation by his enemies, the declarant might falsely incriminate those persons whom he disliked. If the decedent had no religious belief or fear of punishment after death, the statements made while dying would seem to lose much of the trustworthiness traditionally attributed to them. In general, self-serving declarations would be particularly suspect, for the decedent could thereby exculpate himself from questionable association with the circumstances surrounding his death. The declarant's physical and mental state of mind at the moment of death may weaken the reliability of his statements.
Note, *Affidavits, Depositions, and Prior Testimony,* 46 Iowa L.R. 356, 375–76 (1961).

sons set forth below, finds that Defendant, in making the witness unavailable for testimony, forfeited his rights under the Confrontation Clause by his own wrongdoing. As the Sixth Circuit has held, "a defendant only forfeits his confrontation right if his own wrongful conduct is responsible for his inability to confront the witness." *Cromer*, 389 F.3d at 679 (citing Richard D. Friedman, *Confrontation: The Search for Basic Principles*, 86 GEO. L.J. 1011, 1031 (1998)).

### 1. Forfeiture by Wrongdoing

It is well-established that a defendant's misconduct may result in a forfeiture of his or her rights under the Confrontation Clause. As explained by the court in *Steele v. Taylor*, 684 F.2d 1193, 1201 (6th Cir.1982), "[e]mploying a concept of either implicit waiver of confrontation or the principle that a person should not profit by his own wrong, English and American courts have consistently relaxed the hearsay rule when the defendant wrongfully causes the witness's unavailability." *Id.* at 1201. The *Steele* court analogized the principle underlying forfeiture by wrongdoing to the "equitable doctrine of 'clean hands,'" in that both prevent a party from deriving any benefit from his or her own wrongdoing. *Id.* at 1201. More than twenty years later, the Supreme Court affirmed the forfeiture doctrine's grounding in equitable principles. *Crawford*, 541 U.S. at 62, 124 S.Ct. 1354 ("[T]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds...").

Recently, the court in *United States v. Garcia–Meza*, 403 F.3d 364, 370–71 (6th Cir.2005) elaborated on *Crawford's* abiding deference to equitable principles. In *Garcia–Meza*, a defendant, who had admitted to stabbing his wife, was on trial to determine whether he acted with premeditation to support a conviction of first degree murder.[6] *Id.* at 370. Five months prior to her murder, the wife was brutally assaulted. At that time, the wife informed the police that her husband had become violent toward her after he discovered that she had spoken to her former boyfriend. *Id.* at 369. At trial, these statements to the police were introduced to show the defendant's motive for murdering his wife. *Id.* at 368. The defendant objected, arguing that his Confrontation Clause rights were violated because he had not had an opportunity to cross-examine her. The defendant further argued that the forfeiture doctrine was not applicable because he had not killed her with the intent to prevent her from testifying. *Id.* at 370. The court summarily rejected this argument, holding that the motive behind his wrongdoing was irrelevant, reasoning that the forfeiture doctrine's equitable basis, as enunciated in *Crawford*, prevented the defendant from benefitting in any way from his wrongdoing. *Id.* at 370–71 ("The Defendant, regardless of whether he intended to prevent the witness from testifying against him or not, would benefit through his own wrongdoing if such a witness's statements could not be used against him, which the rule of forfeiture, based on principles of equity, does not permit."). Thus, the court concluded, the defendant, by killing the declarant, had forfeited his right to confront her. *Id.; see also United States v. Arnold*, 410 F.3d 895, 916 (Sutton, J., dissenting) ("Our court recently confirmed that the forfeiture doctrine remains alive and well in the aftermath of *Crawford*, concluding that it applies even if the defendant's wrongdoing was not motivated by an effort to keep an individual off the witness

---

**6.** Unlike the defendant in *Garcia–Meza*, who admitted to killing his wife but merely disputed the intent with which it was done, Defendant in the case sub judice has pleaded not guilty to all charges.

stand.") (citing *Garcia–Meza*, 403 F.3d at 370–71).

■ Applying the above principles to the case sub judice, the Court must determine if Defendant, like Garcia–Meza, forfeited by wrongdoing his rights under the Confrontation Clause. If so, then the only equitable result would be to admit Miss McKibben's statement. This scenario presents an interesting problem: "[F]or the court to conclude that the accused committed the act rendering the declarant victim unavailable, the court must also conclude that the defendant committed the criminal act charged, because those two acts are the same." Richard D. Friedman, *Confrontation and the Definition of Chutzpa*, 31 Isr. L.Rev. 506 (1997) [hereinafter Friedman, *Chutzpa* ]. At least one circuit court and several prominent legal scholars have found forfeiture by wrongdoing applicable even though the act rendering the declarant unavailable is the identical offense of which the defendant stands accused.

In *United States v. Emery*, 186 F.3d 921, 926 (8th Cir.1999), the defendant stood trial for killing a federal informant, Christine Elkins. A few days before Ms. Elkins' death, she had informed a federal agent that the defendant had accused her of cooperating with law enforcement and threatened to harm her. During the trial for Ms. Elkins' death, the court admitted her hearsay statement, finding by a preponderance of the evidence that the defendant was responsible for Ms. Elkins' murder. *Id.* at 926. The court acknowledged that it was making a preliminary determination as to the defendant's guilt in the crime for which he was charged, but explained that it was warranted in doing so

because of ("the general proposition that a defendant may not benefit from his or her wrongful prevention of future testimony from a witness or potential witness"); *see also United States v. Johnson*, 354 F.Supp.2d 939, 964 (N.D.Iowa 2005) (admitting a now-dead declarant's statements against accuser, even though the defendant was on trial for the declarant's murder, and citing *Emery* for the proposition that the forfeiture doctrine is applicable to a missing witness's statements "even in a trial for murdering that witness, not just in a trial for the underlying crimes about which the defendant allegedly feared that the missing witness would testify."). Moreover, Professors Sherman J. Clark, James J. Duane, Richard D. Friedman, Norman Garland, Gary M. Maveal, Bridget McCormack, David A. Moran, Christopher B. Mueller, and Roger C. Park Friedman postulated as follows in an amicus brief filed with the Supreme Court in *Crawford*:

> If the trial court determines as a threshold matter that the reason the victim cannot testify at trial is that the accused murdered her, then the accused should be deemed to have forfeited the confrontation right, even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable.

Brief of Amici Curiae Law Professors *Sherman J. Clark, et al.*, 2003 WL 21754958, *24 n. 16, *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (No. 02–9410) (citing Friedman, *Chutzpa* ).

■ Requiring the court to decide by a preponderance of the evidence the very question for which the defendant is on trial may seem, at first glance, troublesome.[7]

---

**7.** At least one court has refused to find the homicide defendant liable for the declarant's death by a preponderance of the evidence, reasoning that "[t]o hold otherwise would be to deprive a defendant of his right to a jury trial and allow for a judge to preliminarily convict a defendant of the crime on which he was charged." *United States v. Lentz*, 282 F.Supp.2d 399, 426 (E.D.Va.2002).

For the reasons outlined below, however, this Court holds as follows: equitable considerations demand that a defendant forfeits his Confrontation Clause rights if the court determines by a preponderance of the evidence that the declarant is unable to testify because the defendant intentionally murdered her, regardless of whether the defendant is standing trial for the identical crime that caused the declarant's unavailability.[8]

■ The Court bases its conclusion on the following tenets of evidentiary law. First, as discussed in *Crawford*, this application of the forfeiture doctrine ensures that a defendant will receive no benefit from his wrongdoing. Second, the jury will never learn of the judge's preliminary finding. Friedman, *Chutzpa* at 523. ("The jury (unless knowledgeable in the law of evidence) will not be aware that the judge made a finding on the evidentiary predicate"). Moreover, the jury will use different information[9] and a different standard of proof to decide the defendant's guilt. *Id.* ("[A]lthough the two questions may be identical, they are tried separately for separate purposes."). Third, analogous evidentiary situations permit a judge to determine preliminary facts even though the exact same facts may be necessary to the jury's final verdict. For example, statements offered against a defendant to prove his participation in a charged conspiracy are admissible if the court first finds, by a preponderance of the evidence, that the conspiracy for which defendant is on trial existed. *Bourjaily v. United States*, 483 U.S. 171, 175–76, 107 S.Ct.

2775, 97 L.Ed.2d 144 (1987) (holding that where a defendant is charged with conspiracy, the court, by a preponderance of the evidence, can make an initial determination that the conspiracy existed so as to determine whether a co-conspirator's statement can be admitted as non-hearsay under FED.R.EVID. 801(d)(2)). The same principle applies to the forfeiture doctrine when the court makes a preliminary determination as to whether the defendant committed the crime for which he is a charged. *See Emery*, 186 F.3d at 926 (basing its approach to the forfeiture doctrine on the co-conspirator cases, noting "the functional similarity of the questions involved . . . ."); *see also United States v. White*, 116 F.3d 903, 912 (D.C.Cir.1997) ("[T]he forfeiture finding is the functional equivalent of the predicate factual finding that a court must make before admitting hearsay under the co-conspirator exception.").

In sum, the equitable principles outlined in *Crawford*, the jury's ignorance of the court's threshold evidentiary determination, and the analogous evidentiary paradigm of conspiracy permit this Court to make a preliminary finding as to whether Defendant's wrongdoing resulted in the unavailability of the declarant, Miss McKibben, even though he is on trial for her murder.

■ Turning to the instant case, the Court finds by a preponderance of the evidence that Defendant's actions rendered Miss McKibben unavailable. The Defendant's confession compels this conclusion. Shortly after Defendant's arrest

---

8. Because the issue does not arise in the instant case, this holding does not take into account the prosecution's duty, if any, to depose a declarant if there is ample time to do so between the declarant's statement and her death. *See* Friedman, *Chutzpa* at 525.

9. In making a preliminary determination, the trial court has at its disposal all the information in the record, except privileged information. FED.R.EVID. 104(a) ("Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court . . ." and "[i]n making its determination it is not bound by the rules of evidence except those with respect to privileges."). The jury, of course, only has access to a filtered body of evidence.

on August 9, 2003, he was interviewed by Lieutenant David Livingston of the Greenbrier County Sheriff's Department. During this interview, which was videotaped and occurred in the ambulance on the way to the hospital, Defendant admitted to having committed various offenses. Defendant stated as follows:

Q: So, you shot [Tamara McKibben and Franklin Rigsby] in their house?

A: Yep, and drug Kristy out.

Q: Why did you do it.

A: Because she coaxed me into doing it.

Q: So, Kristy had you kill her mom and stepdad?

A: So she could be with me.

(Videotape Tr. at 14).[10] As for having shot Miss McKibben, Defendant acknowledged as such:

Q: Did you fire the Tech–9?

A: Yes.

Q: Who did you fire it at?

A: Tammy McKibben and Frank Rigsby, as well as myself and Kristina.

Q: Okay. Who all did you fire it at? Tell me again.

A: Frank Rigsby, Tamara McKibben, Kristina McKibben, and myself.

(Videotape Tr. at 12).

On June 10, 2005, the Court held an evidentiary hearing to determine whether Defendant made these statements knowingly and voluntarily, and concluded: "Defendant's *Miranda* waiver was made voluntarily, knowingly, and intelligently, and . . . all statements made subsequent to the waiver were made free from police coercion and with mental clarity." *United States v. Mayhew*, 380 F.Supp.2d 915, 930, 2005 WL 1762620, at *10 (S.D.Ohio June

22, 2005) (denying Defendant's Motion to Suppress). Based upon Defendant's confession, the Court finds, by a preponderance of the evidence, that Defendant effectuated Miss McKibben's unavailability. Because Defendant cannot profit from his wrongdoing and because suppressing Miss McKibben's statement would allow him to do just that, the Court finds her audiotaped statement admissible.

 Alternatively, Defendant argues that any probative value of Miss McKibben's statement is substantially outweighed by the danger of unfair prejudice, asserting that her audiotaped statement to Sergeant Cahill is likely to appeal to jurors' emotions and cloud their ability to focus on disputed facts. Rule 403 of the Federal Rules of Evidence requires the Court to conduct a balancing test to determine the admissibility of such evidence: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. . . ." FED.R.EVID. 403. The term "unfair prejudice," as used in Rule 403, "does not mean the damage to the defendant's case that results from the legitimate probative force of the evidence; rather, it refers to evidence which tends to suggest decision on an improper basis." *United States v. Mendez–Ortiz*, 810 F.2d 76, 79 (6th Cir.1986). The Court has listened to her statement, which includes an account of the alleged kidnapping and alleged shootings, in addition to a description of the circumstances surrounding these events, and concludes that the probative value of this evidence is beyond question. The statement goes to the heart of the kidnapping charge. Although the tape may arouse the jury's sympathy, the probative value of the tape outweighs any

---

**10.** The Court had the audio-videotape transcribed by Professional Reporters, Inc. (hereinafter "Videotape Tr.").

prejudicial effect, and hence, overwhelmingly favors its admission. If this Court excluded all evidence likely to elicit an emotional response from the jury, the government would effectively be prohibited from presenting but a dearth of evidence.[11]

Thus, the Court holds that Miss McKibben's audiotaped statement is admissible pursuant to the forfeiture doctrine and that the statement's probative value is not substantially outweighed by the danger of unfair prejudice. Defendant's Motions in Limine to Exclude Kristina McKibben's Oral Statement is **DENIED**.

### C. Miss McKibben's Letters

Defendant moves to exclude four letters written by Miss McKibben. The first letter, addressed to Tamara McKibben and written in the two week period preceding August 7, 2003, refers to Miss McKibben's troubled relationship with Defendant. [Docket No. 135, Ex. A]. The next two letters, dated August 2, 2003 and August 4, 2003, are both addressed to Tom McQueen, Miss McKibben's then-new boyfriend. These letters relay her desire to have a child with Mr. McQueen. [Docket No. 135, Exs. B, C]. The fourth letter, dated August 8, 2003 and addressed to her mother, describes Miss McKibben's grief upon losing her recently-deceased mother.[12] [Docket No. 84, Ex. A]. As detailed below, the Court holds that the letter written sometime prior to August 7, 2003 is

admissible during the trial phase and sentencing phase, the letters to Mr. McQueen are irrelevant both to the trial phase and the sentencing phase, and the August 8, 2003 letter is more prejudicial than probative for purposes of the trial phase, but may be admitted during the sentencing phase.

 As a preliminary matter, the Court finds the two letters addressed to Mr. McQueen are not relevant to either the trial or the sentencing phase of this case. FED.R.EVID. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). These letters have no bearing on Defendant's case, on any of the charged offenses, or on Miss McKibben's experiences as they relate to Defendant.

With regard to the two remaining letters, both written by Miss McKibben and addressed to her mother, the parties focus on whether the letters are testimonial in nature and then argue about the letters' probative value. As a threshold matter, however, the court must determine whether these letters are in fact hearsay. The first letter, which Miss McKibben wrote to her mother in the two weeks prior to

---

11. Certain portions of the tape, however, are *not admissible* during the trial phase. First, the tape contains approximately two minutes during which Miss McKibben, per the paramedic's instructions, unsuccessfully attempts to take a deep breath. Each attempt results in what sounds like a fit of coughing and vomiting. This portion of the tape is not relevant to the determination of Defendant's guilt; however, it will be admissible as victim impact evidence. Second, Miss McKibben mentions the nature of Defendant's 1992 conviction (kidnapping) and the victim of that kidnapping (Defendant's ex-wife). This information is similarly inadmissible during the

trial phase. With regard to this excerpt's admissibility during the sentencing phase, the Court will make that determination prior to the sentencing phase, if necessary.

12. The government initially moved to admit an undated notebook page with a list of ten states allegedly visited by Kristina McKibben and Defendant between August 7, 2003 and August 9, 2003. The notebook page was attached to the August 8, 2003 letter. The government has since indicated that it no longer intends to proffer this piece of evidence.

August 7, 2003, describes Miss McKibben's past experiences with Defendant:

I hate the fact that in order to get away from [Defendant] I had to leave you and all the rest of the people I love.... Me getting beat was bad and I regret every beating but getting beat everyday and still being able to see you is better then being over 100 mi[les] away and not being able to see you with not getting beat.

[Docket No. 135, Ex. A]. Similarly, in her August 8, 2003 letter, Miss McKibben wrote, "[a]ll I can do is ... wish I would have just stayed and taken the beatings instead of leaving. Because at least I could see you whenever I wanted to." [Docket No. 84, Ex. A]. This letter also refers to the circumstances surrounding her mother's death: "I talked to Nana and she said that you and Frank are dead. I am hoping with all of my heart that you guys aren't.... I didn't think he would hurt you or Frank." *Id.*

■ Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove *the truth of the matter asserted.*" *Id.* (emphasis added). Where the statement is offered to prove the state of mind of the declarant, that statement is not being offered for the truth of the matter asserted. *See United States v. Williams,* 952 F.2d 1504, 1518 (6th Cir.1991) (holding that testimony offered to establish the victim's "fearful state of mind" was not hearsay because, in the extortionate scheme at issue, the statements demonstrated the victim's fear of economic harm, which was "an essential element of the crime charged"); *see also Anthony v. DeWitt,* 295 F.3d 554, 563 (6th Cir.2002) (allowing a witness to testify that she received a threat from a non-testifying declarant, holding, "[h]er testimony did not constitute hearsay because the out-of-court

statements were admissible to explain her actions on the night of the murder and her inaction in approaching the authorities afterwards").

■ In the case sub judice, the government has indicated its intent to introduce these letters as proof that Miss McKibben was seized against her will, which is an essential element of the charged kidnapping offense. *See United States v. Dixon,* 592 F.2d 329, 340 (6th Cir.1979) ("[T]he heart of the crime of kidnapping is a seizure and detention against the will of the victim.") (internal citations omitted). Her state of mind and whether she believed she had any choice but to accompany Defendant is a crucial question the jury must resolve. These letters, then, will not be offered for the truth of the statements made therein, but rather for the limited purpose of demonstrating Miss McKibben's state of mind at the time of the alleged kidnapping. Thus, they are not hearsay.

Although the parties have argued that the admissibility of these letters is to be determined by the Confrontation Clause and the Supreme Court's holding in *Crawford,* this Court finds that the Confrontation Clause is not implicated because the statements are not hearsay. *Crawford* made explicit that "[t]he Clause does not bar the use and admission of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford,* 541 U.S. at 59 n. 9, 124 S.Ct. 1354 (citing *Tennessee v. Street,* 471 U.S. 409, 413, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)). This Court notes that even if this evidence were hearsay, it would be non-testimonial, and thus, would not fall within *Crawford's* ambit. The test for determining whether a statement is testimonial asks "whether a reasonable person in the declarant's position would anticipate his statement being used against

the accused in investigating and prosecuting the crime." *Cromer*, 389 F.3d at 675. A reasonable person in Miss McKibben's position would not have anticipated that letters to her mother would be introduced in a future prosecution. As stated by Professor Friedman in *Confrontation: The Search for Basic Principles*, 86 Geo. L.J. 1011, 1043 (1998), a "statement made in the course of going about one's ordinary business, made before the criminal act has occurred or with no recognition that it relates to criminal activity." *Id.* (offering five "rules of thumb" for determining what evidence should be considered testimonial).

In the case sub judice, Miss McKibben wrote the first letter before the charged crimes occurred, thus, it can easily be categorized as non-testimonial. The second letter, a letter of apology written to her already deceased mother, is essentially a plea for forgiveness. While it comments on the physical abuse she received from her father and mentions the way in which her mother and Frank Rigsby died, it appears to have been primarily a cathartic exercise.

■ Defendant, in the alternative, argues that if the Court finds the letters otherwise admissible, they should be excluded as more prejudicial than probative. The Court is in partial agreement. With regard to the letter written prior to August 7, 2003, the Court concludes that it will assist the jury in determining the presence of an essential element of the kidnapping charge: whether the victim was seized by Defendant against her will. *See Dixon*, 592 F.2d at 340. The letter details her relationship with her father and may shed light on whether she felt compelled to accompany him. While this letter may arouse the jury's sympathy, the danger of unfair prejudice does not substantially outweigh the letter's probative value. Thus, applying the Rule 403 balancing test, the Court finds that the danger of unfair prejudice does not substantially outweigh the probative value.

■ In contrast, the Court finds little probative value in the August 8, 2003 letter. While the letter tangentially mentions Miss McKibben's state of mind, this information is cumulative as it will already have been introduced by the first piece of correspondence. Moreover, the majority of the August 8, 2003 letter is a heart-wrenching exercise in self-blame, during which Miss McKibben begs her mother for forgiveness. The Court agrees with Defendant's assessment that this letter is emotionally inflammatory and has little probative value, if any, as to Defendant's guilt. It will, however, be admissible during the sentencing phase as victim impact evidence.

## IV. CONCLUSION

Assuming, *arguendo*, that this case reaches the sentencing phase, the Court finds Miss McKibben's audiotaped statement and her letter written prior to August 7, 2003 admissible both during the trial and sentencing phases. The August 8, 2003 letter is excluded from the trial phase but admissible during the sentencing phase. The letters to Mr. McQueen are excluded for purposes of both the trial phase and the sentencing phase.

**IT IS SO ORDERED.**